IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 13, 2005

## STATE OF TENNESSEE v. VICTOR L. POWELL

**Direct Appeal from the Circuit Court for Madison County**
**No. 03-590     Roger A. Page, Judge**

_____

**No. W2004-02375-CCA-R3-CD  - Filed December 13, 2005**

_____

The defendant, Victor Powell, was convicted of two counts of vehicular homicide (by recklessness and by intoxication), three counts of vehicular assault, and two counts of driving under the influence. The conviction for vehicular homicide by recklessness was merged into the conviction for vehicular homicide by intoxication. In addition, both convictions for driving under the influence were merged into the conviction for vehicular homicide by intoxication. The trial court imposed consecutive sentences of twelve years for vehicular homicide and four years for each vehicular assault conviction. In this appeal, the defendant asserts that the evidence was insufficient and that the trial court erred by refusing to grant a second mental evaluation. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Clayton F. Mayo (at trial); and David H. Crichton, Assistant Public Defender (on appeal), Jackson, Tennessee, for the appellant, Victor L. Powell.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; James G. Woodall, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On the evening of April 23, 2003, twelve members of the Vilonia United Methodist Church left Vilonia, Arkansas to attend the Icthus Christian Music Festival in Kentucky. The group, which was traveling in two separate vehicles, a GMC Yukon and a church van, stopped briefly in Memphis before continuing east on Interstate 40. Near Jackson at mile marker 71, a trailer pulled by the Yukon, the second in the caravan, was struck by the defendant's vehicle. Marc Townsend, the driver of the Yukon lost control and the vehicle flipped four times before coming to rest on the westbound side of the interstate. Several passengers were ejected and one later died. The defendant was

arrested for his role in the accident. The defendant was charged with three counts of vehicular assault for the injuries to Marc Townsend, Charles Himmler, and Scott Cordova. He was also charged with vehicular homicide by recklessness and by intoxication for the death of Keith Townsend and with two separate counts of driving under the influence.

At trial, Charles Coker, a member of the church, testified that the youth group had planned the trip to Icthus for several months. Coker testified that the other adults attending the festival were Lisa Johnson, who was the youth director, and Marc Townsend and that the teenagers making the trip were Jessica, Sara, and Katie Coker, Addie Wells, Erica Wyatt, Scott Cordova, Kayley Johnson, Keith Townsend, and Charles Himmler. Coker recalled that the group left the church at approximately 8:00 p.m. on the evening of the accident. Because the music festival was a camping event, the group packed all their camping gear onto a fourteen-foot, single-axle trailer that was attached to the Yukon. According to Coker, Erica Wyatt, Addie Wells, and the three Coker girls were riding in the church van while Ms. Johnson and the remaining teenagers were with Marc Townsend in the Yukon.

Coker testified that the group stopped approximately forty minutes prior to the accident for gas, snacks, and a restroom break before continuing eastbound on Interstate 40. He stated that the Yukon was in the lead and that the van followed approximately one hundred feet behind. Coker recalled that somewhere near mile marker 70, a blue or black sedan passed his vehicle in the left lane, drifted toward the Yukon, and then struck the left rear of the trailer. Coker testified that the car then "jerked back to the left real hard." He stated that when the car struck the trailer, "it just knocked it sideways." According to Coker, the Yukon then swerved and rolled over three or four times before coming to rest in the westbound lanes of the interstate. Coker related that he directed his daughter to use her cellular telephone to call 911, grabbed a flashlight, and found the trailer, which had come unhitched, as well as Himmler and Kayley Johnson in the median strip. Coker described both Himmler and Kayley Johnson as injured but conscious. He recalled that Keith Townsend, who was lying in the middle of the roadway, was conscious but not coherent. Coker remembered that after hearing Ms. Johnson shout that she could not find Cordova or Marc Townsend, he found the badly injured Marc Townsend was trapped inside the Yukon. Coker recalled that Marc Townsend's scalp had been essentially peeled away from his skull. He stated that Cordova, who was some forty feet away from the vehicle, had "massive facial injuries."

Coker testified that when the ambulance arrived, he directed EMS workers to Keith Townsend first because he "didn't think Marc had a chance" and that despite the efforts of the EMS workers, Keith Townsend died at the scene. Coker stated that after being freed from the vehicle, Marc Townsend was transported by helicopter to the nearest hospital while the others were transported by ambulance. Coker recalled that he saw the defendant after the accident but did not speak to him.

Lisa Johnson, the youth director, testified that Marc Townsend was driving the Yukon and that she was in the front passenger seat. She recalled that Keith Townsend was just behind her seated next to Charlie Himmler and that her daughter, Kayley, was in the back seat with Scott

Cordova. She remembered that at midnight, everyone sang "Happy Birthday" to Keith Townsend, ate ice cream, and then settled down to sleep. Ms. Johnson testified that approximately fifteen minutes later, she felt a "huge jolt" that felt like they had been struck by a "semi," the trailer fish-tailed, and then Marc Townsend lost control of the vehicle. According to Ms. Johnson, the Yukon flipped at least four times before coming to rest on the other side of the interstate. She remembered that Marc Townsend, who had been thrown over the console onto her leg, was very badly injured and that the other occupants had been thrown from the vehicle.

Ms. Johnson recalled crawling out of the window and finding her daughter and Himmler in the median. She related that Keith Townsend, who later died at the scene, was lying in the roadway and that Cordova, whose face had been "mutilated," was lying closer to the vehicle. According to Lisa Johnson, she saw the defendant and a companion at the scene and later saw the defendant at the hospital. She described the defendant, who was in handcuffs, as belligerent.

Marc Townsend testified that he has no recollection of the accident or the month following it. He stated that he received severe injuries in the accident, including a traumatic head injury and a broken hand. According to Townsend, the head injury had residual effects on his memory, speech, and movement. He recalled that he was hospitalized for approximately two months, that he required physical therapy for five weeks, that he had a permanent loss of hearing, and that he had to learn how to speak and walk again after the accident.

Sixteen-year-old Charlie Himmler testified that he was nearly asleep in the Yukon when he "was jarred very violently." He stated that he remembered little about the accident but knew he suffered a concussion, a broken collar bone, and numerous lacerations and abrasions.

Scott Cordova, also sixteen years of age, testified that he could not remember anything about the accident. He stated that he suffered five broken bones in his face, a "blown orbit," a closed head injury, and two broken arms. Cordova testified that he received home-schooling for the remainder of the year.

Scott Sanders, paramedic for the Jackson Medical Center EMS, testified that he and his partner, Tommy Parchman, who were the first to arrive on the scene, found "debris scattered all over the westbound lanes of I-40." He recalled that a bystander waived them over to examine Keith Townsend, who took his last breath as they rolled him over onto his back. Unable to revive Keith Townsend, Sanders and Parchman moved to Marc Townsend, who was trapped inside the Yukon and bleeding from a massive head injury. Sanders related that they pushed Marc Townsend back into the Yukon, placed a collar around his neck to stabilize his spine, and applied direct pressure to the "scalping" wound on his head. Sanders confirmed that the "jaws of life" were used to free him from the vehicle before he was transported by helicopter to the hospital.

Dr. John Campbell, a neurosurgeon, testified that Marc Townsend had "multiple injuries to his face, a large scalp laceration . . . [and] severe facial swelling." A CT scan revealed "multiple facial fractures" as well as "bruising on the left frontal portion of his brain, and . . . a collection of

blood between the covering over the brain and the brain itself." Dr. Campbell stated that Townsend was given a sedative and admitted into the intensive care unit, where he stayed for nine days before being transferred to Baptist Hospital in Little Rock, Arkansas.

Dr. Jimmie W. Kee, a plastic and reconstructive surgeon who examined Cordova in the intensive care unit testified that Cordova had "fairly severe" abrasions and gouges over his entire face. He stated that "[b]oth of [Cordova's] eyes were completely swollen." According to Dr. Kee, Cordova suffered a displaced fracture of his nose and a "blow-out" fracture of the left orbit bone, which could affect his ability "to move his eye properly."

Dr. David Roberts, an assistant medical examiner who examined the body of Keith Townsend testified that the cause of death was "multiple blunt trauma to [the] abdomen and chest," "secondary to [a] motor vehicle accident." He stated that no autopsy was performed.

Claude Cain of the Tennessee Highway Patrol, who was the first Trooper to arrive on the scene, testified that both the eastbound and westbound lanes of the interstate were blocked with debris from the accident. Trooper Cain recalled that the defendant admitted being the driver of the 1993 BMW but was unable to produce a driver license or registration for the vehicle. The officer testified that when he noticed an odor of alcohol on the defendant and observed a small, brown bottle of liquor in the floorboard of the driver's side, he placed him in the back seat of the patrol car. According to Trooper Cain, the right front fender of the defendant's vehicle was severely damaged, the windshield on the passenger's side was shattered, and the driver's side airbag had deployed. He testified that when he returned to his patrol car, he noticed a strong odor of alcohol. Trooper Cain described the defendant as "arrogant" and confirmed that he refused to submit to a blood test. Trooper Cain stated that he placed the defendant under arrest for vehicular homicide and transported him to the hospital so that blood could be drawn. According to the officer, the defendant became combative when they reached the hospital at approximately 3:00 a.m. and refused to cooperate. Restraints were used to immobilize the defendant while blood was drawn. Trooper Cain testified that he witnessed the drawing, labeled the blood, and, on the following day, transported it to the TBI laboratory in Memphis.

Wilma Taylor, a phlebotomist at Jackson General Hospital, testified that she drew blood from the defendant at the request of Trooper Cain. She confirmed that she gave the blood directly to the officer. Robert Marshall, a forensic scientist with the TBI, tested the sample and determined that the defendant's blood alcohol content was .1066 %.

Molly Greer, an employee of Wilhite's Truck Stop, testified that the defendant, who was a regular customer at the truck stop, came into the store on the evening of the accident to pick up a money order. She described the defendant as loud, appearing drunk, and smelling of alcohol. She testified that the defendant showed her his driver license when he cashed his check and that she forgot to return it.

Trooper Barry Waldrop, an expert in accident reconstruction, testified that he took several photographs of the scene and marked the area with orange fluorescent paint so that he could return during the day to take measurements. He recalled that the Yukon was severely damaged and that the defendant's BMW had damage to the right front fender area. Trooper Waldrop stated that he observed a "skid mark emanating from the right front tire [of the BMW] that led backwards back down the eastbound lane" and a gouge mark caused by the deflated tire. He testified that he was able to find the "common point" where the two vehicles collided, which was in the eastbound lanes. Trooper Waldrop determined that the distance from the common point to the location where the BMW came to rest was more than five hundred feet. Trooper Waldrop, who went to the hospital where the defendant and the victims had been taken, testified that he took photographs of Cordova and Himmler but was unable to photograph Marc Townsend due to the extent of his injuries. He stated that when he attempted to photograph the defendant, the defendant "lashed out" at him and "became physical and started fighting, twisting, turning his head, . . . trying to . . . keep his face from being photographed." According to Trooper Waldrop, the odor of alcohol in the room where the defendant was being held was "very pungent." He described the defendant's demeanor as "extremely loud and boisterous" and remembered the defendant "screaming that his rights were being violated, his constitutional rights, his civil rights were being violated."

Trooper Waldrop, who returned to the scene of the accident with Trooper Max Anderson in order to continue his investigation, testified that he took measurements, created a topographical map of the scene, and then went to the wrecker yard to examine the two vehicles. Trooper Waldrop stated that he discovered a 50 milliliter bottle of Godiva Cappuccino liquor and an empty bottle of Skye Blue Malt Liquor in the defendant's BMW. He testified that Marc Townsend's wife, Debbie, gave him permission to remove the airbag module from the Yukon to assist in the investigation. Trooper Waldrop, who used a computer program from the manufacturer of the module to download the information, stated that although the airbag on the Yukon did not deploy during the accident, "there was a severe enough jolt, [that] it woke the module up and it started storing data." He related that the data from the module indicated that during the five seconds before the crash, the Yukon was traveling at a speed of sixty-three miles per hour and that Marc Townsend was wearing his seatbelt.

Trooper Waldrop testified that after examining all of the information he had obtained during his investigation, he concluded that the post-impact speed of the defendant's vehicle was seventy-one miles per hour. He also determined that the point of impact between the defendant's vehicle and the Yukon's trailer occurred in the right lane of the eastbound side of the interstate. Trooper Waldrop was able to ascertain that the rpm speed of the Yukon just before the accident was consistent with the vehicle being on cruise control. He explained that because the post-impact speed of the Yukon was seventy-one miles per hour, he was able to determine that the defendant's vehicle would have had to have been traveling at least eighty-four miles per hour at the time of impact in order to have increased the speed of the Yukon by eight miles per hour. It was Trooper Waldrop's opinion that the defendant's vehicle struck the Yukon as the Yukon traveled in its own lane.

Dr. Kenneth E. Ferslew, a forensic toxicologist and an expert in toxicology and alcohol concentration, testified that when alcohol is ingested, it follows the "body water" into all the tissues

and eventually crosses the blood brain barrier. According to Dr. Ferslew, when the cross-over occurs, the body identifies the alcohol as a foreign substance and immediately begins the process of elimination by exhaling, metabolizing, and urinating. Dr. Ferslew explained that the elimination rate of alcohol is "17 milligrams per deciliter from our blood per hour." According to Dr. Ferslew, the defendant's blood alcohol concentration at the time of the crash was .145 %. He testified that even if the defendant consumed the alcoholic beverages that were found in his car after the accident, that would not have explained a blood alcohol concentration amount of .1066% at the time of testing.

Dr. Ferslew testified that at a blood alcohol concentration of .145%, the defendant would have demonstrated a loss of coordination, a loss of hand-eye control, a loss of sensibilities, a loss of attention span, and an alteration of his judgment. It was his opinion that the defendant's ability to operate a motor vehicle would have been impaired. Dr. Ferslew stated, however, that he could not determine with certainty the precise degree of the defendant's impairment.

The defendant testified that in the days prior to the accident he had been in Montgomery, Alabama, and had returned to the west Tennessee area for his cousin's wedding. He stated that after driving in from Alabama, he rested at his grandmother's house in Humboldt. The defendant claimed that on the afternoon before the accident, he had picked up his cousin, Jarvis Tyson, and returned to his grandmother's house to "counsel" Tyson. He contended that when he discovered that Tyson had brought liquor with him, he poured out the liquor and told Tyson he would have to leave. In a bizarre account of the events leading to the accident, the defendant claimed that he placed Tyson under "citizen's arrest" because Tyson was wanted by the police. The defendant, who asserted that he was a military police officer, explained that he initially turned Tyson into law enforcement officers at the Ramada Inn before eventually deciding to handle the matter himself. He claimed that the airbag on his BMW deployed when Tyson tried to steal his car while they were stopped at Wilhite's Truck Stop and the defendant "switch[ed] on" his "device." He testified that he asked a mechanic at Wilhite's to replace the airbag.

The defendant denied any involvement in the accident and claimed that because of his medical training, he was present at the scene to help the accident victims. He explained that he and his vehicle were taken there by a tow truck driver because "they" were redoing the tanks and needed to clear the truck stop of all vehicles. The defendant claimed that there was a tractor-trailer accident on the ramp leading to Wilhite's Truck Stop and that the truck "had seeped out fumes." He insisted that the tow truck driver transported him and his car to the scene of the Yukon accident because "[t]he only thing [his] car had to do was stay elevated to where the . . . air compensation, you know, could turn around and surmise itself to where it could, . . . get all the combustion and bubbles from out of the tire."

During cross-examination, the defendant asserted that the reason his blood test was positive for alcohol was because the phlebotomist "turned around and stuck the thing up [his] butt." He contended that his car was damaged in the tractor-trailer accident on the ramp near Wilhite's Truck Stop.

I

In this appeal, the defendant first asserts that the evidence was insufficient to support the convictions. He contends that there was insufficient proof that he was impaired at the time of the accident. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

"Vehicular homicide is the reckless killing of another by the operation of an automobile . . . [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213(a)(2) (2003). "A person commits vehicular assault who, as the proximate result of the person's intoxication as set forth in § 55-10-401, recklessly causes serious bodily injury to another person by the operation of a motor vehicle." Tenn. Code Ann. § 39-13-106(a) (2003).

In this instance, the evidence established that the BMW driven by the defendant drifted into the lane of travel of the Yukon and crashed into the trailer. The trailer fish-tailed, causing Marc Townsend to lose control of the vehicle. Witnesses testified that the vehicle flipped at least four times before coming to rest on the opposite side of the interstate. Keith Townsend died as a result of his injuries. Marc Townsend was severely injured, suffering permanent problems with his hearing, speech, and memory. Himmler and Cordova, who were ejected from the vehicle, required lengthy hospital stays and experienced the continuing effects of their injuries. It was Trooper Waldrop's opinion that the defendant's vehicle was traveling at least eighty-four miles per hour at the time of the crash, some twenty-four miles over the posted speed limit. The airbag module of the Yukon indicated that it was traveling a steady sixty-three miles per hour at impact. There was proof that the defendant smelled of alcohol and was belligerent after the accident. A witness who had seen the defendant shortly before the accident said he appeared to be drunk. His blood alcohol concentration at the time of testing was .1066%, above the statutory threshold, and as high as .145% at the time of the accident. An expert concluded that a blood alcohol concentration at that level would cause a loss of coordination, difficulty with hand and eye control, and impaired judgment. Although the defendant claimed that he did not consume any alcohol on the evening of the accident and contended that he was not even involved in the accident, the jury was free to reject the theory offered by the defendant and fully accredit the evidence offered by the state. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). The jury was properly instructed on proximate cause. Under these circumstances, it is our view that the evidence was sufficient to support the convictions for vehicular homicide and vehicular assault.

II

The defendant also contends that the trial court erred by refusing to grant his request for a second mental evaluation. The state submits that because the defendant had already been declared competent, the trial court did not err by refusing to grant a second mental evaluation.

In Dusky v. United States, 362 U.S. 402 (1960), the Supreme Court ruled that a defendant is competent if he has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and if he has a reasonable and factual understanding of the proceedings. Id. at 402. The Dusky standard has been adopted in Tennessee. See State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991); State v. Benton, 759 S.W.2d 427, 429 (Tenn. Crim. App. 1988); Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975). In Mackey, this court determined that the defendant must be able to understand the nature and object of the proceedings against him, must be able to consult with counsel, and must be able to assist in the preparation of his defense. 537 S.W.2d at 707.

The burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). The determination of competency is within the sound discretion of the trial court. State v. Caughron, 855 S.W.2d 526, 538 (Tenn. 1993); State v. Howard, 926 S.W.2d 579 (Tenn. Crim. App. 1996). Where the trial judge failed to conduct an evidentiary inquiry, the question on appeal is whether he should have experienced doubt with respect to the defendant's competency to stand trial. Berndt v. State, 733 S.W.2d 119,122 (Tenn. Crim. App. 1987).

Here, the trial court granted the defendant's first request for a mental evaluation. Although the report of the forensic evaluation was not made a part of the record for this appeal, the trial court referred to the conclusions reached in the report at the hearing on the motion for a second evaluation. The doctor who performed the evaluation apparently determined that the defendant was competent to stand trial. The trial judge, satisfied with the conclusions in the initial report, ruled that the defendant was competent and had failed to establish any basis for a second evaluation. At trial, the defendant expressed an understanding of the charges against him and an awareness that he was not required to testify at trial. When asked by the trial court if he wanted to testify on his own behalf, the defendant indicated his desire to do so because it was his opinion that his testimony would not make things any worse. While his answers were often lacking in logic, nothing indicated that the defendant did not have a reasonable and factual understanding of the proceedings. Because it appears that the defendant understood the "nature and object of the proceedings" and could assist in the preparation of a defense, it is our view that the trial court did not err by refusing to grant a second mental evaluation.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE